## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHAKIYLA CARTER, Individually and** | : | |
| **As Personal Representative of the** | : | **Civil Action** |
| **Estate of Richard Carter,** | : | **No. 23-cv-1867-KM-DFB** |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **DAUPHIN COUNTY,** | : | |
| **PRIMECARE MEDICAL, INC.,** | : | |
| **ELIZABETH NICHOLS,** | : | |
| **Administratrix of the** | : | |
| **Estate of Dr. Robert Nichols, and** | : | |
| **TSAURAYI DEREDZA,** | : | |
| | : | |
| **Defendants.** | : | |

## THIRD AMENDED COMPLAINT (CIVIL ACTION)

## I.    INTRODUCTION

1. Richard Carter died while wearing nothing but a paper smock and housed in a cell with no internal heat source on the coldest day of 2022. Plaintiff seeks redress for Richard Carter's avoidable death while in custody at Dauphin County Prison. It is brought under 42 U.S.C. § 1983 and the laws of Pennsylvania.

## II.    PARTIES

2.  Plaintiff Shakiyla Carter is the daughter of Richard Carter and the Personal Representative/Administrator of his Estate.

3.  Richard Carter (hereinafter "Decedent") died in December 2022 while in custody of Defendant Dauphin County and under the care of Defendant Primecare Medical and its agents and employees.

4.  Defendant, Dauphin County, a county of the Commonwealth of Pennsylvania, owns, operates, and staffs Dauphin County Prison ("DCP").

5.  Defendant Dauphin County contracts with Defendant PrimeCare Medical, Inc., ("Primecare"), a Pennsylvania business, for the provision of medical and health services, and was responsible for providing prison health services and appropriate and timely care and treatment to inmates of Dauphin County Prison.

6.  Elizabeth Nichols is the duly-appointed Administratix of the estate of Defendant, Dr. Robert Nichols ("Nichols"), now deceased.  Dr. Nichols was an adult individual who, at all times material herein, acted individually and in his official capacity as Lead Psychologist for Primecare at Dauphin County Prison.

7. Defendant, Tsaurayi Deredza, was at all relevant times employed as a Correctional Officer by Dauphin County.

## III.    JURISDICTION AND VENUE

8. This action is brought pursuant to 42 U.S.C. § 1983 and defendants' conduct alleged herein was performed under color of state law. Jurisdiction is founded upon 28 U.S.C. § 1331.

9. This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

10. Venue is properly laid in this judicial district, as all defendants are found therein, and all acts and events giving rise to the complaint occurred therein.

## IV.    ALLEGATION OF MATERIAL FACT

11. From on or about December 20, 2022 until his death on December 24, 2022, decedent was confined at DCP.

12. At all relevant times, Decedent was a "pre-trial detainee," held on bail set at $10,000.

13. At all relevant times, Primecare was the exclusive medical and mental health provider for those in the custody of DCP.

14. Decedent had been confined at DCP on at least one prior occasion, during which time Primecare was the exclusive medical provider for those in the custody of Dauphin County Prison.

15. At the time of his death, Decedent was 63 years old and suffered from COPD, for which he utilized an oxygen tank to assist with breathing.

16. Nevertheless, Decedent was not in end-stage COPD.

17. The presence of Decedent's oxygen tank was an obvious indicator even to those without medical training of a serious medical condition.

18. On December 21, 2022, the prison's health screening staff noted that Decedent suffered from COPD and that, based on past incarceration, was known to suffer significant respiratory problems.

19. Late December 2022 was a period of historic, extreme cold across much of the United States, including Harrisburg, PA.  According to the National Centers for Environmental Information, "[o]n December 21-25, a powerful arctic front wreaked havoc across much of the nation . . . that sent temperatures plummeting at record speed.  More than 200 million people were under a winter weather advisory or warning...."[1]

---

[1] https://www.ncei.noaa.gov/access/monitoring/monthly-report/national/202212

20. The temperature in Harrisburg, PA from December 20 – 24 reached a low each day below freezing. The high temperature on December 23 was about 47 degrees Fahrenheit, and thereafter dropped to below freezing until sometime on December 27. After reaching a high of 47 degrees on December 23, the temperature dropped below freezing by noon on its way to a low of 6 degrees Fahrenheit that day, and would not rise above about 15 degrees Fahrenheit on December 24.

21. Cold temperatures are a well-known risk for patients with COPD, making it more difficult to breathe, and increases the risks of hypothermia which further increases respiratory distress.

22. COPD is the third-leading cause of death worldwide and thus linked to a high healthcare burden.

23. COPD and the necessary care and management it requires are thus well-known in both the medical and correctional industries.

24. During Decedent's initial intake at DCP, he was purportedly not willing to cooperate with prison and medical staffers' requests for information.

25. Decedent completed his intake screenings on December 21, 2022, around 6:00 AM, which indicated no risk of drug withdrawal or suicide.

26. On December 21, 2022, at around 3:12 PM, Decedent was seen by Defendant Nichols, who placed Decedent on "Level 1 Suicide Watch."

27. Dr. Nichols did not perform any evaluation or assessment of Decedent, and his order to place Decedent on Level 1 Suicide Watch cited no suicidal ideation or other psychiatric conditions warranting that placement, and instead noted in Decedent's chart that the Level 1 placement was because Decedent was merely "yelling and cursing, mostly unintelligible but clearly unwilling to speak with clinician – refusing intake."

28. Defendant Nichols's determination served no legitimate penological or medical purpose, and instead was merely punitive and vindictive.

29. At all relevant times, Level 1 Suicide Watch was the most repressive and intrusive "suicide prevention" measure, requiring monitoring by prison or medical staff at irregular intervals not to exceed 15 minutes.

30. Moreover, inmates on Level 1 Suicide Watch are stripped of their clothing and underwear and dressed in only a paper smock, they are housed in a cell with no personal items or items of comfort, they are not able to shower or shave, are not given toilet paper, and are not provided with utensils for meals.

31. A Level 2 designation would permit clothing instead of a smock, and Level 3 the addition of socks and bed sheets.

32. Defendant Nichols was authorized by his employer, Primecare, to place inmates on Suicide Watch, and to determine which level of suicide watch, those determinations being without review or subject to reversal.

33. Staff psychologist Dr. Garrett Rosas expressed disagreement with Defendant Nichols's decision to place Decedent on suicide watch as a punitive measure, telling him that it was unnecessary and unsuitable under the circumstances.

34. Dr. Nichols, as authorized by Primecare's policy, overruled Dr. Rosas's objections.

35. Prior to Decedent's death, Dr. Rosas had expressed concerns to Primecare about Defendant Nichols's practice and custom of placing inmates on suicide watch as a punitive measure unmoored from any legitimate penological, medical, or psychological basis.

36. The only source of heat on the medical unit where Decedent was placed on suicide watch is from vents located in the hallways; there is no direct heating of the cells themselves.

37. In 2023, after Decedent's death and the earlier death on the same medical unit of Jamal Crummel, Dauphin County announced a plan to "cut slots in doors and vents in ceilings to improve ventilation in jail cells that have long had no heating sources."[2]

38. Crummel had hypothermia when he died on January 31, 2022, when the highest temperature recorded that day was 2 degrees Fahrenheit above freezing.

39. A news article on Crummel's death noted that DCP's "heating and cooling system has been a [known] problem for years."[3]

40. The lack of heating in DCP cells, particularly the unit where Decedent and Crummel died, was well known to Prison and County officials, as well as to Primecare and its employees and agents: in June 2022, discussing Crummel's death, Dauphin County District Attorney Fran Chardo stated that "in this particular area, the cells were much lower temperature [sic], and it

---

[2] https://www.pennlive.com/news/2023/04/new-vents-planned-for-dauphin-county-jail-cells-with-no-heat.html

[3] https://www.witf.org/2022/06/07/dauphin-county-jail-cells-were-ice-cold-days-before-a-prisoner-died/

was because the heating elements were in the corridors, and if you tried to heat it, the corridors would get too hot."[4]

41. In January 2022, a Dauphin County Prison inmate reported that ice had formed on the inside of his cell window.[5]

42. Defendant Nichols was aware of the grave risk to Decedent when he placed Decedent on suicide watch, but dismissed criticism of that decision and concern for Decedent's well-being, stating, "Fuck him, he can freeze in that smock."

43. On December 23, at around 9:30 PM, Decedent was given medications, which he took without assistance.

44. On December 23, beginning shortly before 10:00 PM, defendant Tsaurayi Deredza, a Correctional Officer employed by Dauphin County Prison, was assigned to Decedent's cell block and was responsible for checking on Decedent at irregular intervals not to exceed fifteen minutes.

45. Defendant Deredza  represented that they checked on Decedent at intervals of exactly 15 minutes.

---

[4] Id.

[5] Id.

46. At each check, Defendant Deredza reported that Decedent was "quiet/seclusive."

47. "Drowsiness" and "exhaustion or feeling very tired" as well-established symptoms of hypothermia.[6]

48. It is further well-established that "[o]lder adults with inadequate… clothing[] or heating are among those most at risk for hypothermia.[7]

49. Given Decedent's medical condition and the extreme cold, coupled with a lack of clothing and heat, that evening, his "quiet/seclusive" affect was an obvious indication of a serious medical issue warranting investigation and intervention.

50. Deredza reported that Decedent was "quiet/seclusive" at 12:15 AM on December 24, 2022, and then changed that entry to reflect a medical issue.

51. Deredza wrote that at 12:15 AM, Decedent "shouted that he was failing to breathe" and that they then called for medical intervention.

52. Decedent also complained that his nose was filled with foamy discharge, which is consistent with symptoms of a COPD patient's exposure to extreme cold and/or hypothermia.

---

[6] https://www.cdc.gov/disasters/winter/staysafe/hypothermia.html

[7] Id.

53. Deredza further reported that Decedent's breathing tube had fallen from his nose.

54. Hypothermia, and exposure to extreme cold, impairs cognitive and motor function.

55. Decedent used his oxygen tank self-sufficiently and was otherwise capable of replacing his own breathing tube but for the symptoms of exposure to extreme cold and/or hypothermia to which he was succumbing.

56. Sgt. Bryan Jordan and CO Tyler Babula of Dauphin County Prison reported that a medical emergency was not called until 12:20 AM.

57. According to Babula, the reason for the medical emergency was that Carter was unresponsive.

58. Deredza reported that by the time assistance arrived, Decedent had lost consciousness, requiring CPR to be performed.

59. The Coroner's Report noted instead that "during rounds, staff checked on Decedent and found him pulseless and not breathing."

60. An official statement by DCP regarding the death of Decedent, issued on December 28, stated that, based on video evidence, his last interaction with

prison or medical staff occurred on December 23, 2022 at 9:31 PM, a few hours before he died.[8]

61. Although the earlier (9:31 PM) interaction was captured on video, the statement merely set forth that "staff also made 15 minute rounds on Carter's cellblock," because even four days after his death and a written Extraordinary Incident Report made the same day, there was no evidence that Deredza actually checked on Carter.[9]

62. Deredza misrepresented their observations of Decedent in the hours leading to his death, and/or failed to actually perform the required observations of Decedent while his health deteriorated under obviously dangerous conditions.

63. Lifesaving measures ceased at approximately 12:54 AM.

64. Richard Carter's official time of death was 1:25 AM on December 24, 2022.

65. The autopsy of Decedent noted evidence of pulmonary edema and congestion, which findings are consistent with hypothermia.

66. Decedent's official cause of death was "Complications from COPD," which is consistent with Decedent's exposure to extreme cold.

---

[8] https://www.dauphincounty.gov/home/dc-news/2022/12/28/man-63-dies-at-lancaster-county-prison-on-dec.-24-investigation-ongoing

[9] Id.

67. An hour after Crummel's death, when the door to his cell had been open for that hour, the temperature in his cell was recorded at 62 degrees Fahrenheit.

68. Already reeling from the fallout of Crummel's death, upon Decedent's medical emergency and knowing it was one of the coldest days of the year, DCP officials directed that the heat in the M-Block hallway be turned up, and a "temperature scan" be taken of Decedent's cell after the door had been opened for close to an hour to allow the room to heat up, and then included in an official statement of the death that the scan was taken "immediately after" the initiation of the medical emergency (which was not true) for the purpose of influencing public perceptions about Decedent's death and the conditions of DCP, and to obfuscate Defendants' role in Decedent's death.

69. As a result of the foregoing violation of Decedent's constitutional rights, Decedent suffered significant damages and harms, including but not limited to:

    a. loss of liberty;

    b. emotional distress;

    c. severe physical pain and suffering;

    d. dread and apprehension of death;

    e. interference with his daily activities;

  f. wage loss and loss of earning capacity;

  g. all other forms of damages provided pursuant to 42 Pa.C.S. §8302;

some or all of which are ongoing and/or permanent.

70. As a result Decedent's wrongful death, Plaintiff Shakilya Carter suffered significant damages and harms, including but not limited to:

  a. Loss of her father and the attendant loss of services, society, and comfort;

  b. Funeral expenses;

  c. Estate administration expenses

  d. All other forms of damages provided pursuant to 42 Pa.C.S. §8301.

71. Plaintiff's and Decedent's damages and harms were caused by the culpable conduct of Defendants, alleged in greater detailed herein.

72. The conduct of Defendants Nichols and Deredza was carried out in wanton and outrageous disregard for the Constitution and Decedent's rights thereunder, and was motivated solely by their self-interest, completely unrelated to the administration of justice, thereby warranting an award of exemplary damages against each.

## V.    CAUSES OF ACTION

### COUNT ONE
### Plaintiff v. Deredza
### 42 U.S.C. § 1983 (Fourth and Fourteenth Amendments)

73. Plaintiff incorporates by reference each of the preceding as though each were set forth herein in their entirety.

74. Deredza was aware that Decedent was suffering from a serious medical need while entrusted with monitoring him on M-Block.

75. Deredza knew that the temperature was dangerously cold and that Decedent was dressed in only a paper smock.

76. Despite their knowledge of the risks Decedent faced, and/or facts from which she could and should have inferred the existence of the risk, Deredza failed to take any measure to ameliorate same.

77. Deredza failed to take reasonable measures to guarantee Decedent's safety or provide Decedent with necessary medical treatment in deliberate indifference to his serious medical need.

78. Decedent suffered the harms and damages alleged hereinabove as a direct and proximate result of defendants' violation of his rights under the Fourth and Fourteenth Amendments of the Constitution of the United States

## COUNT TWO
### Plaintiff v. Nichols
### 42 U.S.C. § 1983 (Fourth and Fourteenth Amendments)

79. Plaintiff incorporates by reference each of the preceding as though each were set forth herein in their entirety.

80. Nichols was aware that Decedent was suffering from a serious medical need upon his arrival at Dauphin County Prison, and that housing him on M-Block would increase the risks of harm.

81. Nichols was aware that it would be cold enough on M-Block when he sent Decedent there that even a healthy inmate could freeze.

82. Nichols was further aware that there was not sufficient heating on M-Block to warm the  interior cells there, and that Decedent was clothed in nothing more than a paper smock.

83. Nichols failed to take any measure to ameliorate the risks to Decedent, which risks arose from Nichols's acts and omissions as set forth herein.

84. Nichols failed to take reasonable measures to guarantee Decedent's safety or provide Decedent with necessary medical treatment in deliberate indifference to his serious medical need.

85. Nichols placed Decedent on suicide watch, and under conditions – including the cold – which he knew to be inhumane and unbearable, for purely

punitive reasons with no medical basis, in violation of Decedent's constitutional rights.

86. Decedent suffered the harms and damages alleged hereinabove as a direct and proximate result of defendants' deliberate indifference to his medical needs and his unconstitutional assignment of Plaintiff to M-Block, in violation of Decedent's rights under the Fourth and Fourteenth Amendments of the Constitution of the United States

## COUNT THREE
### Plaintiff v. Dauphin County and Primecare Medical
### 42 U.S.C § 1983 (*Monell* Liability)

87. Plaintiff incorporates by reference each of the preceding as though each were set forth herein in their entirety.

88. As set forth more fully hereinabove and below, Defendant Primecare's and Dauphin County Prison's policies, practices, and/or customs caused Richard Carter's death were unlawful.

89. The practices, customs, and usages, implemented and maintained with deliberate indifference and maintained systematically, of Dauphin County included but were not limited to:

a.  Failing to provide M-block inmates with humane conditions of confinement, including but not limited to failing to provide sufficient heating to M-Block cells when outside temperatures are below freezing;

b.  Failing to appropriately and sufficiently staff M-Block to ensure the proper monitoring of inmates;

c.  Failing to supervise employees such as Deredza to ensure the proper execution of their observations of M-block inmates;

d.  Failing to train employees such as Deredza to identify serious medical conditions experienced by M-block inmates;

e.  Failing to utilize personnel with appropriate medical training to monitor inmates on M-block;

f.  Failing to promulgate policies and procedures to ensure the health and safety of inmates exposed to known risks of extreme cold;

g.  Failing to promulgate policies and procedures to ensure the health and safety of inmates with serious respiratory conditions;

h.  Failing to train employees such as Deredza on how to monitor M-block inmates for symptoms of exposure to extreme cold;

    i.  Failing to communicate and share information with Primecare about inmates' medical conditions and housing assignments and any contraindications therein;

90. The practices, customs, and usages, all implemented with deliberate indifference, of Primecare and maintained systematically, included but were not limited to:

    a.  Permitting the re-assignment of inmates to M-Block as a punitive measure without medical justification;

    b.  Failing to supervise employees such as Dr. Nichols;

    c.  Failing to promulgate policies and procedures for the review of decisions of high-ranking employees such as Dr. Nichols;

    d.  Failing to provide essential medical monitoring and treatment of M-Block inmates during periods of extreme environmental or weather conditions;

    e.  Failing to provide sufficient staff M-Block capable of monitoring the medical conditions of inmates housed there;

    f.  Deliberately delegating its professional medical services to monitor inmates on M-block with known medical conditions and in light of known aggravating environmental conditions to corrections staff with

no medical training; Failing to communicate with Primecare about inmates' medical conditions and housing assignments and any contraindications therein;

g.  Failing to promulgate policies and procedures to ensure the health and safety of inmates exposed to known risks of extreme cold;

h.  Failing to promulgate policies and procedures to ensure the health and safety of inmates with serious respiratory conditions;

i.  Failing to communicate and share information with Dauphin County Prison officials and staff about inmates' medical conditions and housing assignments and any contraindications therein;

91. Primecare and Dauphin County, through the high-ranking officials of each, were aware of numerous facts and circumstances, such that each knew, or from which each could and should have inferred, that Dr. Nichols was engaged in a pattern of unlawful and unconstitutional conduct, that M-Block was acutely dangerous during extreme cold, and that the inmates in their care were routinely deprived of care for their serious medical needs. Such facts and circumstances included but were not limited to:

a.  Complaints from Dr. Rosas an others, including a March 2022 message from Rosas to Primecare leadership that catastrophic failures

of medical and mental health care were imminent because of
entrusting Nichols with a leadership role that he was not capable of
executing;

b. The deaths of at least 16 inmates before Decedent's death since
January 2019, including the January 2022 death of Jamal Crummel
from hypothermia, who had also suffered an earlier case of
hypothermia while in DCP custody (which developed in mostly
above-freezing external temperature).  In 2019, the death rate per
1,000 inmates in Dauphin County was 5.99, while state- and nation-
wide rates were 1.42 and 1.46 (respectively);[10]

c. Purposefully failing to report inmate deaths to the state, evidencing
knowledge of the heightened risks to those in custody at Dauphin
County Prison, the causal connection between the deaths and the
conditions of confinement and lack of medical care, and their own
failures to implement any changes to reduce these known risks and
occurrences of inmate deaths;

---

[10] https://www.reuters.com/investigates/special-report/usa-jails-graphic/

    d.  Knowledge of the special requirements for housing patients with COPD and the attendant risks of exposure to extreme temperatures, which risks do not depend on diminished respiratory health;

    e.  Knowledge of the heating and cooling deficiencies of M-Block, and complaints from staff and inmates of same;

    f.  Knowledge of the levels of and needs for staffing on M-Block;

    g.  Knowledge of deficiencies in communication procedures between Prison and Medical staff, which was identified in a 2023 report authored by former Department of Corrections Commissioner Wetzel, who further noted that the death rate at DCP decreased after the implementation of standing meetings with Prison and Medical staff.

92. After Decedents' death, Dauphin County and Primecare engaged in the conduct set forth herein to obfuscate their causal role in the death, including instituting a sham investigation of Dr. Rosas for the death of an unrelated inmate.

93. Despite these facts and circumstances, and the known conduct of Nichols, Dauphin County and Primecare, through their respective officials, remained deliberately indifferent to them and the risks they engendered for the violation of citizens' rights, and failed to take any meaningful actions to

address them, instead endeavoring to shield Nichols' misconduct and their knowledge thereof from public scrutiny.

94. Decedent suffered the harms and damages alleged hereinabove as a direct and proximate result of defendants' violation of his rights under the Fourteenth Amendment of the Constitution of the United States

**COUNT FOUR**
**Plaintiff v. Dauphin County (Negligence)**

95. Plaintiff incorporates by reference each of the preceding as though each were set forth herein in their entirety.

96. At all relevant times, Dauphin County was in possession of the real property comprising DCP.

97. Dauphin County was responsible for the care, custody, and control of its real property.

98. Dauphin County and its officials, including officials and staff of DCP, knew that there was not sufficient heat for inmates housed on M-Block during periods of extreme cold.

99. Dauphin County failed to exercise reasonable care, custody, and control of its real property by failing to install and/or properly utilize adequate heating sources in M-Block.

100.    Decedent suffered the harms and damages alleged hereinabove as a

direct and proximate result of defendant's negligence.

**COUNT FIVE**
**Plaintiff v. All Defendants**
**42 Pa.C.S. § 8302 (Survival)**

101.    Plaintiff incorporates by reference each of the preceding as though

each were set forth herein in their entirety.

102.    Plaintiff claims the right to prosecute this action and recover on behalf

of Decedent's estate all damages allowable under Pennsylvania's Survival

Act, 42 Pa.C.S. §8302, alleged hereinabove.

**COUNT SIX**
**Plaintiff v. All Defendants**
**42 Pa.C.S. § 8301 (Wrongful Death)**

103.    Plaintiff incorporates by reference each of the preceding as though

each were set forth herein in their entirety.

104.    Plaintiff is the sole known heir of Decedent's estate.

105.    As set forth more fully herein, Defendants caused Richard Carter's

death.

106.    Plaintiff suffered the harms and damages alleged hereinabove as a

direct and proximate result of defendants' conduct in bringing about the

wrongful death of Richard Carter.

## VI.    JURY DEMAND

107.    Plaintiff demands a jury determination of all issues so triable.


## VII.   PRAYER FOR RELIEF

WHEREFORE, plaintiff prays the Court for judgment in her favor, against

all defendants, individually, jointly and severally, and asks for the following relief:

a)    compensatory and general damages;

b)    punitive damages against all individual defendants;

c)    attorney's fees and costs pursuant to 42 U.S.C. § 1988;

d)    such interest and other costs as are allowed by law;

e)    such other relief as the Court deems just and equitable.

Respectfully submitted,

WILLIAMS CEDAR


*/s/ Christopher Markos*
By: Christopher Markos, Esq.
PA ID No. 308997

Gerald J. Williams, Esq.
PA ID No. 36418
One South Broad Street
Suite 1510
Philadelphia, PA 19107
cmarkos@williamscedar.com
p. 215-557-0099
f. 215-557-0673

Dated: May 16, 2024